NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

DON JACOB HAVATONE, *Appellant.*

No. 1 CA-CR 14-0223
FILED 10-27-2015

Appeal from the Superior Court in Mohave County
No. S8015CR201201535
The Honorable Derek C. Carlisle, Judge Pro Tem

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Colby Mills
*Counsel for Appellee*

David Goldberg, Fort Collins, CO
*Counsel for Appellant*

**MEMORANDUM DECISION**

Presiding Judge John C. Gemmill delivered the decision of the Court, in which Judge Donn Kessler and Judge Diane M. Johnsen joined.

**G E M M I L L**, Judge:

¶1 Defendant Don Jacob Havatone appeals from his convictions and sentences for two counts of aggravated DUI, each a Class 4 felony; one count of aggravated assault, a Class 3 felony; one count of endangerment, a Class 6 felony; and four counts of assault, each a Class 2 misdemeanor. He argues that the trial court abused its discretion when it (1) denied his motion to suppress the results of his blood test, (2) admitted his statements to police at the scene, (3) denied his motion to preclude the testimony of an officer, and (4) excluded statements of a deceased witness. For reasons set forth below, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2 We view the evidence in the light most favorable to sustaining the convictions and resolve all reasonable inferences against the defendant. *State v. Karr*, 221 Ariz. 319, 320, ¶ 2 (App. 2008). We also resolve any conflict in the evidence in favor of sustaining the verdicts. *State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶3 On September 17, 2012, Havatone drove his red SUV head on into the path of an oncoming vehicle driving westbound on Route 66 between Kingman and Valle Vista, Arizona. A witness driving behind Havatone saw Havatone's SUV drive "erratically" and cross over the center line "four or five times" over the space of several miles prior to the collision. Havatone had four passengers in his vehicle. The other vehicle was occupied by the driver, L.S., only. Shortly after the collision, L.S. saw a male with his foot caught in the SUV's windshield crawl out over the hood and lie down on the ground in front of the vehicle; he saw a second male occupant exit the driver's side of the vehicle and lie down behind the SUV. L.S. recognized the man behind the SUV as Havatone, his acquaintance.

¶4 Department of Public Safety Officer M.P. was among the first to respond to the scene. He contacted Havatone, who was still lying on the ground behind the SUV being attended by medics. When M.P. asked Havatone "[w]ho was driving," Havatone replied, "I was." When M.P. asked him "what happened," M.P. "got no response." M.P. smelled a "heavy odor" of alcohol coming from all occupants of the SUV, including Havatone. M.P. looked inside the SUV and observed numerous beer cans and an open bottle of liquor in the vehicle. Havatone was air-evacuated to a hospital in Las Vegas for treatment. A blood sample taken at the hospital indicated he had a blood alcohol concentration ("BAC") of 0.212.

¶5 The State charged Havatone with Count 1, aggravated driving under the influence of intoxicating liquor while his license was suspended or revoked,[1] a Class 4 felony; Count 2, aggravated driving under the extreme influence of intoxicating liquor with a BAC of .20 or more while his license was suspended or revoked, a Class 4 felony; Count 3, aggravated assault of L.S. with a deadly weapon or dangerous instrument, a Class 3 felony; Count 4, recklessly endangering L.S. with a substantial risk of imminent death, a Class 6 felony; and Counts 5, 6, 7 and 8, aggravated assault with a deadly weapon or dangerous instrument of the occupants of his vehicle. A jury found Havatone guilty of Counts 1 through 4 as charged. Furthermore, the jury found Counts 3 and 4 to be dangerous offenses along with three additional aggravators: 1) Havatone's BAC was greater than .15 at the time of his DUI offenses; 2) Havatone had committed at least two DUIs in the ten years prior to the current DUI offenses; and 3) Havatone had previously been convicted of involuntary manslaughter while driving impaired. As to Counts 5 through 8, involving the passengers/victims in Havatone's vehicle, the jury found him guilty of the lesser included offenses of assault, each a Class 2 misdemeanor.

¶6 The trial court sentenced Havatone to concurrent terms of 2.5 years in prison for the two aggravated DUIs; an aggravated term of 15 years in prison for the aggravated assault of L.S., to be served consecutively to the DUI sentences; a presumptive term of 2.25 years for the endangerment of L.S., to be served concurrently to the sentence for aggravated assault; and time served for each of the misdemeanor assaults. Havatone timely appeals. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1) (1992), 13-4031 and 13-4033 (2010).

## DISCUSSION

### I. Motion to Suppress Blood Test Results

¶7 As Havatone was being helicoptered to a hospital in Las Vegas, Officer M.P. asked dispatch to contact Nevada law enforcement to obtain a blood sample from Havatone. Nevada authorities obtained a sample of Havatone's blood from medical personnel at the hospital. Prior to trial, Havatone moved to suppress the blood test results, arguing that the blood sample was obtained without a search warrant in violation of his

---

[1] The parties stipulated that Havatone's "privilege to drive was suspended and cancelled, and that he knew it was suspended and cancelled."

Fourth Amendment rights. Havatone argued that no exceptions applied to the failure to obtain a warrant for the draw.

**¶8**　　　　Following a hearing, the trial court denied the motion, finding the evidence admissible under both Nevada and Arizona law.[2] In reaching its decision, the trial court found, among other things, that the "officers involved in this case collectively had probable cause to believe that [Havatone] had been driving a vehicle while under the influence of intoxicating liquor." Because Havatone was unconscious when the blood draw occurred, the court determined that Arizona implied consent law applied and no warrant was necessary. The trial court also found that the blood draw was objectively reasonable and that, even if the implied consent statute is unconstitutional, the good-faith exception to the exclusionary rule applied:

> Finally, the Court finds that the officers acted with a reasonable good faith reliance on statutes and cases in effect at the time the blood was seized. Even if *McNeely* applies, the Court finds that no legitimate purpose would be served by suppression of the blood evidence in this case.

(Internal citations omitted.)

**¶9**　　　　We review a trial court's denial of a motion to suppress based solely on the evidence presented at the suppression hearing, *State v. Spears*, 184 Ariz. 277, 284 (1996), and we view that evidence in the light most favorable to sustaining the trial court's ruling, *State v. Gay*, 214 Ariz. 214, 217, ¶ 4 (App. 2007). We review the factual findings underlying the determination for abuse of discretion but review the court's legal conclusions *de novo*. *See State v. Moody*, 208 Ariz. 424, 445, ¶ 62 (2004). We will not disturb a trial court's ruling on a motion to suppress absent a clear abuse of discretion, *Spears*, 184 Ariz. at 284, and will affirm the court's ruling if it is legally correct for any reason, *State v. Perez*, 141 Ariz. 459, 464 (1984).

**¶10**　　　　"Under Arizona law, police may obtain a DUI suspect's blood sample only pursuant to a valid search warrant, Arizona's implied consent law, A.R.S. § 28-1321, or the medical blood draw exception in A.R.S. § 28-1388(E)." *State v. Aleman*, 210 Ariz. 232, 236, ¶ 11 (App. 2005). The trial court found that A.R.S. § 28-1321(A) authorized the blood draw in this case without a warrant. That statute states the following:

---

[2]　Havatone does not assert Nevada law applies; on appeal, he expressly maintains that Arizona law controls.

A person who operates a motor vehicle in [Arizona] gives consent . . . to a test or tests of the person's blood, breath, urine or other bodily substance for the purpose of determining alcohol concentration or drug content if the person is arrested for any offense arising out of acts alleged to have been committed in violation of this chapter . . . while the person was driving or in actual physical control of a motor vehicle while under the influence of intoxicating liquor or drugs.

A.R.S. § 28-1321(A). Further, the "unconscious clause" of the same statute provides:

A person who is dead, unconscious, or otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent provided by subsection A of this section and the test or tests may be administered.

A.R.S. § 28-1321(C).

¶11        For purposes of A.R.S. § 28-1321(C), it is not necessary that there be an actual arrest prior to the blood draw. *See State v. Huffman*, 137 Ariz. 300, 302–03 (App. 1983). An officer must, however, have probable cause to believe a defendant was driving while under the influence. *Campbell v. Super. Ct.*, 106 Ariz. 542, 553–54 (1971); *Aleman*, 210 Ariz. at 236–37, ¶¶ 11–12.

¶12        Nevada has a similar statutory mandate requiring the blood draw of an unconscious DUI suspect:

Except as otherwise provided in subsections 4 and 5, any person who drives or is in actual physical control of a vehicle on a highway or on premises to which the public has access shall be deemed to have given his or her consent to an evidentiary test of his or her blood, urine, breath or other bodily substance to determine the concentration of alcohol in his or her blood or breath . . . .

If the person to be tested pursuant to subsection 1 is dead or unconscious, the officer *shall direct* that samples of blood from the person be tested.

Nev. Rev. Stat. ("N.R.S.") § 484C.160(1), (3) (emphasis added).[3]

### A.    Application of the Good-Faith Exception

¶13        We agree with the trial court that the unconscious clause applies under these facts.  The officers had probable cause to believe Havatone drove while impaired.  At the suppression hearing, M.P. testified that, when he asked Havatone "if he'd been driving [the SUV]," Havatone "advised he was driving the vehicle."  As M.P. spoke with Havatone at the scene, M.P. could smell a "strong odor" of alcohol.  When M.P. looked inside the SUV, he saw an open liquor bottle that was partly consumed and open and unopened cans of beer.  M.P. also learned from L.S. that immediately prior to the collision, the SUV had crossed into L.S.'s lane of traffic and driven straight at his vehicle.  This evidence is sufficient to sustain the trial court's finding that M.P. had probable cause to believe Havatone was driving under the influence.

¶14        Havatone argues that even if there was probable cause to suspect that he was driving while impaired, the blood draw violated his Fourth Amendment rights under the United States Constitution.  He points to the U.S. Supreme Court's ruling in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), to argue that Arizona's unconscious clause violates the Fourth Amendment.

¶15        Even if the unconscious clause is unconstitutional, however, we may still affirm the trial court's decision declining to suppress the blood evidence if we find the good-faith exception to the exclusionary rule applies.  We therefore turn to application of the good-faith exception, which requires determining whether suppression of evidence in this case serves the rule's sole purpose—deterring deliberate, reckless, or grossly negligent law enforcement violations of the Fourth Amendment.  *See Davis v. United States*, 131 S. Ct. 2419, 2426–28 (2011).

¶16        In deciding whether to seek and execute a search warrant, officers M.P. and S.R. were the relevant law enforcement personnel for their respective public safety agencies in Arizona and Nevada.  Both officers testified they made no effort to obtain a search warrant and that it was

---

[3]    The Nevada Supreme Court recently held N.R.S. § 484C.160(7) unconstitutional because it does not allow a driver to withdraw consent, though the court avoided interpreting the "unconscious" provision of § 484C.160.  *See Byars v. State*, 336 P.3d 939, 946 (Nev. 2014).

standard police practice at the time to automatically draw the blood of an unconscious DUI suspect. S.R. explicitly commented that the practice was based on Nevada's implied consent statute.

¶17        In *Davis*, the Supreme Court addressed whether the exclusionary rule applies "when the police conduct a search in compliance with binding precedent that is later overruled." *Davis*, 131 S. Ct. at 2423. The Court emphasized that suppression of evidence is a judicially created prudential doctrine, not a constitutionally granted right. *Id.* at 2426. As such, every police violation of the Fourth Amendment's prohibition against unreasonable searches and seizures does not mandate automatic application of the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 906–07 (1984). Rather, possible Fourth Amendment violations by police must be assessed case by case, and the exclusionary rule is only appropriate in those cases when police culpability outweighs the "substantial social costs" generated by the rule. *Davis*, 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 907).

¶18        The primary social cost of the exclusionary rule is the suppression of what is often reliable evidence, and "an officer who conducts a search in reliance on binding appellate precedent does no more than 'act as a reasonable officer would and should act' under the circumstances." *Id.* at 2427, 2429 (quoting *Leon*, 468 U.S. at 920). In other words, suppression of evidence acquired by an officer relying on then-existing binding common law precedent would have no deterrent effect. Accordingly, the Supreme Court has applied the good-faith exception to situations in which law enforcement relied on an objectively constitutional and valid statute. *See Illinois v. Krull*, 480 U.S. 340, 349 (1987) (explaining that the "application of the exclusionary rule to suppress evidence obtained by an officer acting in objectively reasonable reliance on a statute would have [ ] little deterrent effect").

¶19        To determine whether the good-faith exception to the exclusionary rule applies, we follow the two-part test recently articulated by this court in *State v. Mitchell*, 234 Ariz. 410, 419, ¶ 31 (App. 2014). First, we ask whether binding Arizona or Supreme Court authority explicitly authorized the particular police conduct in question at the time. Second, we determine whether "application of the exclusionary rule would provide meaningful deterrence" of future police conduct. *Id.*

¶20        Initially, the trial court considered the legal issue of which jurisdiction's law applies. Regardless of whether we assess Arizona or Nevada law, statutes in both states "explicitly authorized the particular

police conduct" at issue here. *See id.* Arizona's unconscious clause states, "A person who is dead, unconscious or otherwise in a condition rendering the person incapable of refusal is deemed not to have withdrawn the consent provided by subsection A of this section and the test or tests may be administered." A.R.S. § 28-1321(C). Nevada's unconscious provision is an outright statutory command: "If the person to be tested pursuant to subsection 1 is dead or unconscious, the officer *shall* direct that samples of blood from the person be tested." N.R.S. § 484C.160(3) (emphasis added). Both of these statutes were in effect at the time of Havatone's blood draw. Although the search at issue here involved officers from both jurisdictions, the search was objectively reasonable in either state, so we—like the trial court—need not decide whether Arizona or Nevada law applies.

**¶21**    Havatone cites several Arizona cases[4] that he contends disallowed the police conduct in the present case. None of these cases can be read as declaring the unconscious clause to be unconstitutional for purposes of the good-faith exception. The strongest is *Carrillo v. Houser*, 224 Ariz. 463 (2010). In that case, our supreme court held A.R.S. § 28-1321 requires an arrestee to "unequivocally manifest assent to the testing by words or conduct" before a warrantless blood draw is conducted. *Id.* at 467, ¶ 19. Havatone argues that *Carrillo*, which was decided in 2010, as well as other Arizona precedent stretching as far back as 1998, condemned the police action here. *See State v. Flannigan*, 194 Ariz. 150, 153, ¶ 17 (App. 1998) ("Absent express consent to the blood draw, the police would have been entitled to conduct the warrantless seizure of [defendant's] blood only if (1) they had probable cause . . . and (2) exigent circumstances justified dispensing with the warrant requirement.").

**¶22**    Neither *Carrillo* nor *Flannigan*, however, explicitly invalidated (or even addressed) the unconscious clause of the implied consent statute. In fact, the *Carrillo* court emphasized, "We also do not consider here circumstances in which subsection (C) of the implied consent law . . . may allow warrantless testing of persons incapable of refusing a test." 224 Ariz.

---

[4] Nevada case law explicitly rejected a Fourth Amendment attack on the warrantless drawing of an unconscious suspect's blood. *See Galvan v. State*, 655 P.2d 155, 157 (Nev. 1982) ("The officer, faced with the inevitable and rapid destruction of the evidence *and [the defendant's] unconsciousness*, could reasonably have believed that he was confronted with an emergency, so that he could not delay by obtaining a warrant *or waiting until [the defendant] regained consciousness*.") (emphasis added). We need not decide whether *McNeely* casts doubt on that holding since *McNeely* was decided after the events in this case.

at 467, ¶ 21.  And the *Flannigan* opinion, though it discussed exigent circumstances and exceptions to the warrant requirement, noted "that this case does not involve an application of the Arizona implied consent statute in effect at the time of the arrest. . . . [The defendant] was arrested for violating provisions of Title 13 of the Arizona Revised Statutes, not Title 28."  194 Ariz. at 152–53, ¶ 13.

¶23        Similarly, at the time of the accident, no directly applicable United States Supreme Court authority held the unconscious clause unconstitutional.  All relevant events occurred in September of 2012, prior to the Supreme Court's 2013 decision in *McNeely.*  The reasoning of the United States Supreme Court in *Krull* applies here.  As the Court stated,

> Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law. If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations by an officer who has simply fulfilled his responsibility to enforce the statute as written.

*Krull,* 480 U.S at 350.  While that good-faith exception does not apply if we conclude a law enforcement officer relied upon a statute and "its provisions are such that a reasonable officer should have known that the statute was unconstitutional," *id*. at 355, this caveat does not apply here when no court has expressly found the unconscious clause unconstitutional and the cases at the time of the underlying event cannot be said to have led a reasonable officer to know that the clause was unconstitutional. We do not expect police officers to be legal scholars so long as the overarching police practices on which they relied are not examples of "recurring or systemic negligence" on the part of law enforcement.  *Davis*, 131 S. Ct. at 2428 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)).

¶24        We agree with the trial court that given the presumptively constitutional unconscious clauses, the Arizona and Nevada officers in this case objectively relied in good-faith on statutory mandates allowing the blood draw of unconscious DUI suspects absent express consent.  Under the circumstances, including the then-existing statutes and case authorities, they did not act culpably or in any way that society should seek to deter.  Instead, the officers acted with a reasonable, good-faith reliance on statutes and cases in effect at the time.  We find no abuse of discretion in the trial court's assessment, and therefore affirm its application of the good-faith exception to the warrant requirement.  The exclusionary rule is a "bitter

pill" that must be used as a "last resort" only when it outweighs its "substantial social costs." *Davis*, 131 S. Ct. at 2427 (citations omitted). The rule serves no purpose when, as here, police actions were consistent with an existing statute which had not been declared unconstitutional at the time of the blood draw.

**¶25** Because we affirm the trial court's finding that the good-faith exception to the exclusionary rule applies, we need not reach the issue of whether the unconscious clause, A.R.S. § 28-1321(C), is constitutional. Accordingly, we decline to do so. *See Fragoso v. Fell*, 210 Ariz. 427, 430, ¶ 6 (App. 2005) (explaining that courts should avoid constitutional issues "when other principles of law are controlling and the case can be decided without ruling on the constitutional questions" (quoting *In re United States Currency of $315,900.00*, 183 Ariz. 208, 211 (App. 1995))).

### B. No Waiver of Good-Faith Exception

**¶26** Havatone also argues the State waived its argument for application of the good-faith exception to the exclusionary rule when it failed to address the issue in its answering brief. Havatone quotes Arizona Rule of Criminal Procedure 31.13(c)(1), which he argues mandates that appellate briefs contain the parties' "contentions . . . with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." The State maintains the overarching "implied-consent argument presented by the State on appeal is sufficient to dispose of the ultimate issue at hand—whether the search was valid and admissible." According to the State, because it argued that this court should uphold the trial court's ruling, which included a ruling on the good-faith exception to the warrant requirement, the application of the good-faith exception is encompassed within its arguments.

**¶27** Waiver is most often invoked on appeal when an appellant raises an issue for the first time in the reply brief. *See, e.g., State v. Carver*, 160 Ariz. 167, 175 (1989); *State v. Rodriguez*, 160 Ariz. 381, 384 (App. 1989). In that context, the doctrine of waiver helps avoid the possibility of substantial prejudice to the appellee, who, not on notice of a possible issue on appeal, does not address the issue in the answering brief. More generally, application of the waiver doctrine also prevents the court from "surprising the parties" by deciding issues not raised in the briefing. *See Meiners v. Indus. Comm'n*, 213 Ariz. 536, 538–39 n.2, ¶ 8 (App. 2006) (explaining that waiver is intended "to prevent the court from deciding cases with no research assistance or analytical input from the parties" (internal quotations omitted)). Furthermore, waiver is a procedural, rather

than a jurisdictional, concept. *Id.* As such, we do not apply waiver rigidly or mechanically. *State v. Boteo-Flores*, 230 Ariz. 551, 553, ¶ 7 (App. 2012). In our discretion, we may choose to address issues one or more of the parties failed to properly address in the briefs. *See State v. Lopez*, 217 Ariz. 433, 438 n.4, ¶ 17 (App. 2008) ("Generally, issues raised for the first time in a reply brief are waived. . . [i]n our discretion, however, we address [defendant's] arguments.").

**¶28**        Exercising our discretion here, we conclude that applying the waiver doctrine is not appropriate in this case. First, the good-faith exception was expressly argued and ruled on by the trial court. As we note above, we have an obligation to avoid deciding constitutional issues "when other principles of law are controlling and the case can be decided without ruling on the constitutional questions." *Fragoso,* 210 Ariz. at 430, ¶ 6 (citations omitted). Addressing the good-faith exception in this context is consistent with that obligation. Second, the policy of waiver in the opening brief does not apply in equal force when an issue is omitted or not clearly raised in an *answering* brief. This is especially true here. The trial court's application of the good-faith exception to the exclusionary rule was an independent basis for its decision to decline to suppress the evidence. For that reason, Havatone properly addressed the issue in his opening brief. He was not prejudiced by any lack of notice. Under these circumstances, we decline to decide this case based on the procedural mechanism of waiver, and we exercise our discretion to rule on the merits of whether the trial court abused its discretion in declining to apply the exclusionary rule.[5]

---

[5] The doctrine of confession of error may also be applicable here. When an appellee fails to address a relevant issue in its answering brief or fails altogether to file an answering brief, the court may hold that the appellee's failure to support its position constitutes a confession of reversible error. *Bulova Watch Co. v. Super City Dept. Stores of Ariz., Inc.*, 4 Ariz. App. 553, 556 (App. 1967). Like waiver, however, application of confession of error is within the reviewing court's discretion. *State v. Greenlee Cnty. J.P. Ct.*, 157 Ariz. 270, 271 (App. 1988); *State v. Stewart*, 3 Ariz. App. 178, 180 (App. 1966). We decline to hold the State confessed error here. Because the application of the good faith exception is factual in nature and the record is sufficient to support a conclusion on that issue, a decision on the merits is appropriate. *See State ex rel. McDougall v. Maricopa Cnty. Super. Ct.*, 174 Ariz. 450, 452 (App. 1993).

**¶29**        For these reasons, the good-faith exception to the warrant requirement is applicable and the trial court did not err in denying Havatone's motion to suppress the blood test results.

**II.**        **Motion to Preclude Statements to Police**

**¶30**        Officers M.P. and A.R. spoke with Havatone at the scene while Havatone was being treated by medical personnel. Each of them, at separate times, asked Havatone, "who was driving?" On each occasion, Havatone responded, "I was." A.R. followed up his question by pointing at Havatone and saying "in a question form," "you were driving?" to which Havatone replied, "yes." Havatone moved to suppress his statements to M.P. and A.R. He argued that they were involuntary because he could not comprehend what he was being asked or what he was saying due to his intoxication and head injury. Following a suppression hearing during which M.P. and A.R. testified, the trial court denied the motion. On appeal, Havatone contends the trial court failed to consider the totality of the circumstances and based its decision solely on his positive response to the questions.

**¶31**        We review a trial court's finding concerning the voluntariness of a defendant's statements for an abuse of discretion. *State v. Cota*, 229 Ariz. 136, 144, ¶ 22 (2012). We view the evidence at the suppression hearing in the light most favorable to upholding the trial court's ruling. *Gay*, 214 Ariz. at 217, ¶ 4. We will uphold the court's factual findings concerning the voluntary nature of the statements if they are supported by adequate evidence in the record of the suppression hearing. *Cota*, 229 Ariz. at 144, ¶ 23.

**¶32**        "The test for voluntariness in cases where a defendant is under the influence . . . or has mental disabilities is whether these problems render him unable to understand the meaning of his statements." *State v. Clabourne*, 142 Ariz. 335, 342 (1984). The trial court must examine the totality of the circumstances to determine whether the accused is able to reason, comprehend, or resist. *Cota*, 229 Ariz. at 144, ¶ 24; *State v. Poyson*, 198 Ariz. 70, 75, ¶ 10 (2000). We will sustain the trial court's finding of voluntariness absent clear and manifest error. *Poyson*, 198 Ariz. at 75, ¶ 10.

**¶33**        Officer M.P. estimated that he spoke with Havatone fifteen to twenty minutes after his arrival at the scene. M.P. testified that, when he asked Havatone who was driving, medical personnel were treating Havatone and had just bandaged his head laceration. M.P. observed bleeding from the top of Havatone's head. Nonetheless, when Havatone

12

answered M.P. his eyes were open, his speech was not slurred, he responded to the question asked, and M.P. had no trouble understanding or communicating with him. M.P. testified that he next asked Havatone "if he could tell [him] what happened," but Havatone's eyes were closed at that point and he did not respond. M.P. did not attempt to speak with him further. M.P. noted in his report that Havatone "was in and out of consciousness."

¶34        A.R. testified that he arrived after M.P., and medical personnel were already at the scene. M.P. informed him that Havatone "was the driver" and asked A.R. to assist him in "getting witness statements and trying to find out where everybody was seated in the car." A.R. contacted Havatone while Havatone was "[lying] on the ground at the driver's side rear of his vehicle." Havatone's head was bandaged. A.R. testified that he "simply asked him who was driving the vehicle," and Havatone "stated 'I was.'" A.R. "confirmed with him" by pointing to Havatone and asking "[y]ou were driving," and Havatone said "yes." A.R. testified that Havatone's eyes were open during this exchange, that he was "awake" and "responsive," and A.R. observed no indication that Havatone "had any difficulty understanding him."

¶35        In addition to this testimony, the trial court considered its notes from the suppression hearing on the blood draw in denying the motion to suppress the statements. The trial court framed the issue as "whether or not the defendant understood what was going on or understood the questioning." In ruling on this issue, the court acknowledged that Havatone was being treated for a head wound and that there was argument about his level of intoxication. Ultimately the court decided that there was insufficient evidence to conclude that Havatone did not understand the line of questioning.

¶36        Havatone notes that the trial court incorrectly stated that it had no evidence of his BAC because M.P. testified during cross-examination that the lab reports showed that Havatone's BAC was "above a .20." Havatone also maintains that the trial court ignored testimony that he was going in and out of consciousness at the time. He claims the court's statements show that it premised its decision on inaccurate findings of fact that he did not have a serious injury or an elevated blood alcohol content. However, the fact that his BAC was "above .20" is not dispositive. The question is whether he was "so intoxicated" that he was unable to comprehend the meaning of his statements. *Cota*, 229 Ariz. at 144, ¶ 24. The record shows that  the trial court considered Havatone's physical and mental condition and correctly focused its inquiry on whether, despite

these factors, the totality of the circumstances indicated that he was able to "reason, comprehend or resist" and to understand the "meaning of his statements." *See Clabourne*, 142 Ariz. at 342. The trial court concluded that the fact that Havatone was capable of "giving appropriate answers to the limited questions," including the "open-ended question" about who was driving, indicated that he comprehended the questions posed and that his statements were therefore voluntary. The record supports the trial court's finding. We therefore hold the trial court did not abuse its discretion by denying Havatone's motion to suppress his statements.

### III.    Motion to Preclude Testimony of Officer A.R.

¶37        On October 9, 2013, defense counsel conducted a pretrial interview of M.P. and A.R. In response to questioning by defense counsel at that interview, A.R. stated that after M.P. informed him that Havatone was the driver, A.R. also "asked Mr. Havatone if he was driving the vehicle." A.R. stated that Havatone "simply confirmed that with him." At the evidentiary hearing on January 29, 2014, both officers testified that they asked Havatone who had been driving. On February 3, 2014, the first day of trial, defense counsel moved to preclude A.R.'s testimony, arguing the prosecutor had not disclosed A.R. as a witness, counsel had just learned that A.R. would testify about asking Havatone an open-ended question regarding who was driving, and the late disclosure prejudiced his client. Havatone acknowledged that the prosecutor was unaware of the open-ended nature of the question prior to the testimony at the suppression hearing, but argued that the State was nonetheless responsible for the late disclosure of one of its witnesses. Havatone also renewed his request to preclude all of his statements at the scene. The trial court denied the motion.

¶38        On appeal, Havatone argues the trial court erred by denying his motion and failing to sanction the State for its late disclosure.[6] He argues the trial court's analysis was "severely flawed" because it, in effect, equated notice of his statements to M.P. as notice of his statements to A.R. Imposing sanctions for non-disclosure, including whether to preclude or limit a witness's testimony, is a matter to be resolved in the sound discretion

---

[6]   Havatone also argues that the State failed to disclose A.R. as a witness pursuant to Ariz. R. Crim. Evid. 15.1(b)(1). We disagree because, given the pretrial interview, Havatone was aware that A.R. was a potential witness well before trial.

of the trial court; that decision should not be disturbed absent a clear abuse of discretion. *State v. Armstrong*, 208 Ariz. 345, 353–54, ¶ 40 (2004); *Moody*, 208 Ariz. at 457–58, ¶ 135.

**¶39** Prior to precluding a witness as a discovery sanction, the trial court must make an inquiry into the surrounding circumstances and should only preclude the witness if the other party will be surprised or prejudiced by the testimony, if the discovery violation was motivated by bad faith or willfulness, or any other relevant circumstance. *Armstrong*, 208 Ariz. at 354, ¶ 41 (citing *State v. Schrock*, 149 Ariz. 433, 436-37 (1986)). "We will not find that a trial court has abused its discretion unless no reasonable judge would have reached the same result under the circumstances." *Id.* at ¶ 40.

**¶40** Here, there is no evidence that failure to disclose the open-ended question A.R. posed was motivated by bad faith or willfulness. In fact, defense counsel noted that the prosecutor also learned of it at the time of the January suppression hearing. As the trial court noted here, while the nature of an open-ended question weighs more on the voluntary aspect of Havatone's statements, it does not change the crucial fact that Havatone admitted to two officers at the scene that he was driving the SUV. Furthermore, defense counsel knew of these admissions at least as early as the pretrial interview on October 9, 2013. Therefore, we hold the trial court did not abuse its discretion when it declined to preclude A.R. as a witness.

## IV. Statement of Deceased Witness

**¶41** Prior to jury selection on the first day of trial, the prosecutor informed defense counsel he had learned the previous afternoon that B.N., a witness interviewed by A.R. at the scene, had died. Defense counsel moved to have B.N.'s "witness accident statement" admitted at trial as a present sense impression and recorded recollection[7] pursuant to Arizona

---

[7] The trial court disagreed with Havatone's contention that the statement was a past recollection recorded under Rule 803(5). The trial court did not abuse its discretion, because B.N. was not alive and available at trial to provide foundation for the accuracy of the statement or to testify as to his inability to remember the events. Ariz. R. Evid. 803(5). *See Jacobson v. Deutsche Bank, A.G.*, 206 F. Supp. 2d 590, 597 (S.D.N.Y. 2002) ("A necessary predicate of [Rule 803(5)], however, is that there be a 'witness' with an 'insufficient recollection.'"); *Turbyfill v. Int'l Harvester Co.*, 486 F. Supp 232, 234 (E.D. Mich. 1980) (a written statement would have been admissible under Rule 803(5), had the declarant "been alive and present to testify at the trial" to the necessary foundation).

Rule of Evidence 803. Although the trial court concluded the statement might be admissible as a present sense impression, it denied the motion, finding "the probative value of the statement, assuming it's not hearsay . . . is substantially outweighed by the danger of confusing the issues or misleading the jury." Havatone challenges this ruling on appeal.

**¶42** We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. Payne*, 233 Ariz. 484, 503, ¶ 56 (2013); *State v. Murray*, 162 Ariz. 211, 214 (App. 1989). "To be admissible, evidence must be relevant, Ariz. R. Evid. 401, and its probative value must not be substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence, Ariz. R. Evid. 403." *State v. Hardy*, 230 Ariz. 281, 291, ¶ 49 (2012). An abuse of discretion is defined as "an exercise of discretion which is manifestly unreasonable, exercised on untenable grounds or for untenable reasons." *State v. Woody*, 173 Ariz. 561, 563 (App. 1992) (citation omitted).

**¶43** Defense counsel sought to admit B.N.'s statement that he saw "a man in red shorts that came out from the driver's side of the vehicle." It appears from the record that both Havatone and another man in his car were wearing "reddish shorts" at the scene of the collision. Havatone contends B.N.'s statement was exculpatory evidence that Havatone was not the driver, apparently because the witness said the man he saw emerge from the driver's side lay down in front of the car, and it is undisputed that Havatone was lying at the rear of the car after the collision. According to the prosecutor, B.N. was never fully questioned about this statement when he was interviewed "many months" prior to trial. That was because, at the time, Havatone was not defending on the theory that he was not the driver.

**¶44** The trial court reviewed a copy of B.N.'s statement and copies of photographs made available to it by the parties. The court acknowledged that the photographs showed "two people with red shorts" at the scene. The court read B.N.'s statement in its entirety:

> Driving east on Route 66, I saw a red van weaving into
> oncoming traffic, hitting white car head on. Man in red shorts
> got out of car, driver's side and laid down in front of the car.

The trial court excluded the statement under Rule 403 as confusing because B.N. said he saw the person with the red shorts get out of "a car as opposed to a van" or SUV. The trial court noted that the white car "looks more like a car" and that "the red vehicle looks more like a van." Given that B.N. had

died and there was no opportunity to clarify his statement or to cross-examine him about his observations, the court concluded the statement's probative value was substantially outweighed by the danger of misleading or confusing the jury.

**¶45**     Based on this record, we do not agree that the statement's probative value was substantially outweighed by a danger of confusing the issues or misleading the jury. *See* Ariz. R. Evid. 403. There was no dispute about the nature of the two respective vehicles involved in the collision, so there was little danger that the jury would be confused by the statement's reference to a car rather than an SUV. Only the driver, L.S., had occupied the white car, and no one lay down in the front or rear of it. Nonetheless, exclusion of the B.N. statement was proper because it is hearsay that does not fall within any exception. *See City of Phx. v. Geyler*, 144 Ariz. 323, 330 (1985) (explaining that appellate courts have the obligation "to affirm where any reasonable view of the facts and law might support the judgment of the trial court . . . even if the trial court has reached the right result for the wrong reason.").

**¶46**     At the suppression hearing, Havatone argued the statement was reliable and came within the Rule 803(1) present sense impression hearsay exception.[8] That rule allows for the admission of hearsay if the statement is one "describing or explaining an event or condition, made while or immediately after the declarant perceived it." Ariz. R. Evid. 803(1). The logic underlying this rule is that a spontaneous statement made about an event, sufficiently contemporaneous with that event, is likely reliable because the declarant has had no time to misremember or fabricate his statement. *See State v. Tucker*, 205 Ariz. 157, 165–66, ¶ 42 (2003).[9]

---

[8]  As the proponent of the hearsay evidence, Havatone has the burden of proving that one of the exceptions applied. *See U.S. v. Chang*, 207 F.3d 1169, 1176 (9th Cir. 2000). At the hearing, Havatone offered no argument or evidence of the contemporaneity of B.N.'s statement, but merely stated that the court should hold that the present-sense impression exception applies. The record does not provide sufficient foundation to establish that B.N.'s written report was a present-sense impression.

[9]  By emphasizing the time between the event and when the statement is made, this exception differs from the excited utterance hearsay exception, which requires that the declarant still be subject to the stress or nervous

¶47       There is no bright-line rule determining when the time between an event and a declarant's statement regarding that event becomes too lengthy for the present sense impression to apply. *United States v. Green*, 556 F.3d 151, 156 (3d Cir. 2009); *see also United States v. Hawkins*, 59 F.3d 723, 730 (8th Cir. 1995) (holding that a statement made seven minutes after an event was sufficiently contemporaneous); *United States v. Mitchell*, 145 F.3d 572, 577 (3d Cir. 1998) (holding that a statement made 40 to 50 minutes after an event was not sufficiently contemporaneous).[10] Because no bright-line rule exists, when a question arises as to whether the time between an event and a statement is too long for the statement to be sufficiently contemporaneous, courts have also examined whether the statement was corroborated by other evidence indicating its accuracy and reliability. *See United States v. Blakey*, 607 F.2d 779, 785–86 (7th Cir. 1979) (holding that a statement made no more than 23 minutes after an event was admissiable as a present sense impression because the statement's reliability was corroborated by circumstantial evidence); *see also Hawkins*, 59 F.3d at 730.

¶48       In this case, B.N. wrote his statement at the request of Officer A.R. But A.R. does not recall exactly when he arrived on the scene, nor does he remember in what order he questioned the witnesses once he arrived. It is undisputed, however, that A.R. arrived after Officer M.P., who arrived at 10:28 a.m., in response to a call about the accident at 10:15 a.m. Therefore, B.N.'s statement could not have been made earlier than 13 minutes, and most likely was made much later than 13 minutes, after he observed the accident. Although the period of time may have been shorter than the 23-minute interval approved in *Blakey*, the statement here differs from *Blakey* because it was not substantially corroborated by other evidence. B.N.'s account was contradicted by the testimony of M.P., L.S., and another eyewitness, D.R. All three of these witnesses testified that the person who eventually lay down in front of the red vehicle did so after being thrown out of the windshield and hunched over the engine block. Additionally, B.N.'s statement was not a spontaneous observation, but rather a response to police requests that he complete a written accident report form. This further supports the conclusion that the statement was not a present sense impression, because B.N. had time to think through what he saw before he wrote his statement. *See Green*, 556 F.3d at 157 (explaining that a statement

_____

energy created by the event. *See Miller v. Keating*, 754 F.2d 507, 512 (3d Cir. 1985) (citing J. Weinstein, *Evidence* ¶ 803(2)).

[10] Because Rule 803(1) is identical to Federal Rule of Evidence 803(1), we view federal cases construing the rule as authoritative. *See Lennon v. First Nat'l Bank of Ariz.*, 21 Ariz. App. 306, 308 n.3 (App. 1974).

was not a present sense impression when it was "only made *after he had been questioned by* [authorities] about the details of the transaction the statement purport[ed] to describe.").

**¶49**        Considering all of these factors and based on this record, we conclude B.N.'s written statement was not made while observing or immediately after the accident. Because B.N.'s statement was not made contemporaneously with his observation of the accident, it does not qualify as a present sense impression under Rule 803(1). It is therefore inadmissible hearsay. The trial court did not err in excluding it.

## CONCLUSION

**¶50**        For these reasons, we affirm Havatone's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama